Maril *v.* The Connecticut Fire Insurance Company.

1. Upon a policy of insurance which covers a stock of material used in a particular business, and which contains a printed condition prohibiting the keeping and use of certain inflammable substances upon the premises in which such business is conducted, a recovery may be had in case of loss, even though it should appear that such inflammable substances were in fact kept and used upon the premises, provided it shall further appear that the business in the conduct of which the stock of material insured was used is of such a character as that the use of such inflammable substances is a necessary, usual and customary incident to said business, and that such substances were kept only in such quantities and used only in such manner as, in view of the subject of the insurance, must have been in contemplation of the parties at the time the policy was issued.

2. ·If the business in question be of such a character as that some of
the inflammable substances, against the keeping of which pro-
vision is made in the printed conditions of the policy, themselves
constitute component parts of the stock of material used in such
business, the policy would cover such inflammable substances and
a recovery could be had for loss thereof, notwithstanding the
printed condition against the keeping of such inflammable sub-
stances.

3. If in the stating clause of a policy of insurance the thing insured
be described in general terms as a stock of "watchmaker's mate-
rials," and there be nothing in the policy itself indicating with
exactness what articles were embraced in and intended to be cov-
ered by such general terms, parol evidence is admissible to ex-
plain the ambiguity, and to apply the policy to the subject of the
insurance.

February 18, 1895.

Action on fire policy.   Before Judge MacDonell.
City court of Savannah.   February term, 1894.

The policy was written upon "watches, jewelry, dia-
monds, silver and plated ware, clocks, musical instru-
ments, fancy goods, brick-a-brack, and other merchan-
dise usual to a jewelry stock in and out of safes," and
"watchmaker's material; all while contained in the
three-story brick, metal-roofed building situated at
number 24 Barnard street, in Savannah, Ga." The.
policy on its face provides that it shall be void "if the
risk be increased by any means within the control of
the assured, . . or if . . benzine, gasoline, petro-
leum or crude earth or coal oils are kept or used on the·
premises without written consent."   There is this fur-
ther clause in the policy: "Kerosene oil, if of the legal
standard, may be used for lights; lamps to be filled by
daylight only; one barrel may be kept on the premises
for this purpose; and may also be kept for sale in stores,
in quantities not exceeding five barrels at any one time;
if kept in greater quantities, without written consent,
this policy shall be void."

The plaintiff's testimony was: On the 7th day of June,
1892, a fire occurred on the premises covered by this

policy. The value of my stock was at that time $9,200. I was engaged in the jewelry business. $4,500 of this stock was in my safe. An appraisement was made on the stock, which appraisement placed the damage at $3,440. I have never been paid that amount, or any part of it. The loss on my stock by the fire was $3,440. I am twenty-six years old. I have been in Savannah ten years in November next. I was born in Russia, lived there until I was fourteen years old, when I went to New York, where I lived two years, since which time I have lived in Savannah. The fire occurred between three and four o'clock in the morning, and started on the north side of the store. Mr. Sack, my watchmaker, had the key to the shop. He did my repairing, in consideration of which I allowed him bench room. I do not know the cause of the fire, and have no idea what caused it. It looked as if the fire started under the counter; there was paper there. The fixtures were burned up; they were a total loss. A good deal of the stock could not be used. The fixtures were of wood. The walls and sides were badly charred. I do not know whether it looked like a flash fire or not, and to this day I have no theory as to how the fire started. The store was lighted by gas. I never kept kerosene oil, or benzine or naphtha for sale. None of these belong to a jewelry stock. I had a demijohn with kerosene oil in it. I do not know how big it was; it may have been a 3-gallon demijohn, but my opinion is that it was not less than 2 nor more than 3. Six or eight weeks before the fire I bought kerosene; I cannot tell the exact date. The kerosene in this demijohn was bought and used for the purpose of cleaning clocks. · I never used it myself; I am not a watchmaker. I had it there for that purpose. I am positive it was used for cleaning clock movements, and maybe, if the movements were rusty, it was used for watches too. It was

my oil but Mr. Sack used it; I saw him use it for clean-
ing clock movements. After he would use it, he would
pour it back in the demijohn. I looked at the demijohn
the morning after the fire. I testified at the former
trial that it looked as if this demijohn had as much
kerosene in it after the fire as it had before the fire.
There must have been two quarts or a half-gallon in it.
I do not know how much was in it before the fire. I
presume there was the same amount in it after the fire
as there was before. After the fire I did not see any
cork. I swore on the last trial that it was uncorked,
and my memory was fresher then than it is now; I was
probably right then. The demijohn was sitting on a
shelf in the rear of the store, on the south side. It was
in a safe place. It had been sitting there for three
months and had never fallen off. That was the place
we always kept it. On this occasion there was one lamp
that had oil in it that I know of. That was a student
lamp Mr. Sack used. It was on the bench and fell off,
I presume. Kerosene was used in it. Then there was
a piano lamp. It was one that I had sold and it was
brought back; it had some oil in it. It was a large
lamp, I presume, which would hold a quart. It was not
nearly half full, but there was some kerosene in it.
There was about a pint or a little more of benzine on
hand. It was in a bottle that might hold a quart. I
saw one can of oil on hand. There were two cans there;
one had very little in it, and the other was about full.
I had no turpentine there. On the morning after the
fire the insurance gentlemen and the firemen showed
me some paper which they said was saturated with tur-
pentine. I do not know whether it was or not. I
do not know whether the paper was wet with kero-
sene or benzine; maybe it was water; maybe there was
some kerosene on the paper; I do not know. I do not
know how kerosene got there if it was there. Maybe I

said at the time that I did not know how it got there. On January 1, 1892, in making my tax returns I swore that the market value of my stock was $1,800. Mr. Sack used the student lamp on his bench for night work. The benzine and kerosene that were there were used for cleaning purposes, cleaning the movements of clocks and watches. Benzine is used for cleaning watches. The amount of kerosene purchased was 10 cents worth. The benzine was kept near Mr. Sack's bench; I had nothing whatever to do with it. It was kept in a glass bottle. The benzine had nothing whatever to do with the fire, as far as I could see. The kerosene can that was full or nearly full would hold about two or three quarts. That kerosene was used by Mr. Sack, and was kept near Mr. Sack's bench on his side. He used it to put it in his lamp; maybe he used it for cleaning purposes too. The fire did not start near that can of kerosene. The other kerosene can was one that Mr. Sack said leaked, and we did not use it much. If there was kerosene on the paper there, I presume that the lamp must have turned over and some kerosene reached the paper. The piano lamp was turned over. At the time I made my tax return I owed about $5,000. I did not think that I should pay taxes on my debts. My idea was to deduct the amount of purchase money, and the balance represented what was liable for taxes. I counted that $9,200 less $5,000 would make $1,800. I simply owed the money but owned the stock. The lamp that was upset was on the same side the paper was lying on, the north side. The paper was not right at the lamp; the oil might have spread there. The paper was under the shelving, and the lamp was on the other side of the shelving. I do not know what quality of kerosene was in the demijohn. I just sent out and got 10 cents worth of kerosene; this oil was in the demijohn. I got it for cleaning purposes. The can which Mr. Sack used for his lamp, maybe, was a gallon can.

Defendant moved for a nonsuit.  Plaintiff offered to testify, that at the time the insurance was effected he was carrying on a jewelry business, selling and repairing watches and clocks; that he intended to continue such business, and this fact was known to defendant; that in this business, and as a part of the watchmaker's materials, and as incidental, necessary, usual, customary and naturally pertaining to the stock and business, the kerosene and benzine were used in small and reasonable quantities for such business in cleaning the works of watches and clocks, the kerosene being used in part in the student's lamp; and that said kerosene and benzine did not cause the fire, nor contribute to it, and were not even consumed in whole or in part by the fire.   The court refused to admit this testimony, and granted the nonsuit.  Plaintiff excepted.

GARRARD, MELDRIM & NEWMAN, for plaintiff.
DENMARK & ADAMS, for defendant.

ATKINSON, Justice.

With the addition that evidence was introduced showing that proofs of loss were submitted to the defendant company within the time prescribed, and a demand for payment made in writing; that the demand was never complied with; that suit was brought within the time limited by the policy, and proof made that from three hundred to three hundred and fifty dollars would be a proper allowance for counsel fees for the prosecution of this litigation, the facts as stated in the official report are sufficiently full for the determination of the questions made in this record.   It will be seen from an examination of the official report, as amended *supra*, that the plaintiff proved his loss, the submission of proofs of loss, a demand for payment in accordance with the terms of the policy sued upon, and the value of counsel fees; and closed.   A motion for nonsuit was made, upon what

v 95-39

special ground does not appear in the record; but we may presume from the line of argument pursued here, and the fact that the plaintiff made such a case as would undoubtedly have authorized a finding for him, that the motion for nonsuit was predicated upon the ground that the plaintiff had rendered void his policy of insurance by keeping and using upon the premises occupied by him benzine and kerosene, contrary to the conditions of his policy of insurance, which prohibited the same. The evidence showed that in his store the assured kept a small quantity each of kerosene and benzine, of the former all told, including that in lamps, about one gallon, of the latter about one pint or a little more. None of either was destroyed by fire. After the court had signified its intention to grant a nonsuit, but before the order to that effect had been taken, the plaintiff offered to prove, in addition to the evidence already submitted, that at the time the insurance was effected, he was carrying on a jewelry business, selling and repairing watches and clocks; that he intended to continue such business, and this fact was known to the defendant; that in the conduct of this business, and as a part of a watchmaker's material, and as incidental, usual, customary and naturally pertaining to the stock and business, kerosene and benzine were used in small and reasonable quantities in cleaning the works of watches and clocks, the kerosene being used in part in a student's lamp (kept in the store); and that said benzine and kerosene did not cause the fire, nor contribute to it, and were not even consumed in whole or in part by the fire. This testimony was repelled by the court as being inconsistent with the contract as expressed in the policy; whereupon the court granted a nonsuit, and to this judgment exception is taken.

We are not now to consider whether, in view of the very trifling and inconsiderable quantities in which the

prohibited inflammable substances were used and kept, and the fact that they were so kept as not materially to have affected the risk of the insurer or in any manner to have contributed to the loss, the court would in the first instance have been authorized to grant a nonsuit; but whether, with the supplemental evidence offered, it should have done so. The first question to consider is, whether the testimony offered was competent. The contract of insurance was in writing, and the rule of law is, that parol evidence is inadmissible to add to, take from, or vary the terms of an unambiguous written contract; and the kindred rule to this is, that if the written agreement appears from its terms to be so ambiguous as not fully to express the contract between the parties, parol evidence is admissible to explain such ambiguity. If the written agreement is full, explicit and unambiguous, it must be taken as conclusively representing the real contract between the parties, and neither will be permitted by parol to in any manner vary its terms. If, for want of fullness of statement, the contract be indefinite or uncertain, parol evidence is admissible, not to vary, add to or take from the contract, but to explain and so illuminate it as to make the real intention of the parties apparent. It will be seen by an examination of its provisions that the policy of insurance covers a number of articles specifically, including watches, diamonds, clocks, etc., and finally by the use of the words "watchmaker's materials" such articles as would be comprehended within that general descriptive term. In order to determine what was covered, or by the parties intended to be covered, by that general term, it is necessary to inquire somewhere what it means. No index to its meaning is afforded by any other expression contained in the policy; there is nothing in that instrument to indicate what the parties intended should be its meaning. It is therefore an expression which must be classed

as ambiguous, and being ambiguous, parol evidence is admissible to explain its meaning. The plaintiff offered to prove that both kerosene and benzine in reasonable quantities were used in his business as a part of a watchmaker's material, and that their use as such was necessary, customary and usual in the conduct of such business; that he was engaged in the conduct of this business at the time this insurance was effected, and that the defendant knew such to be the fact. Had he proven these facts to the satisfaction of the jury, then he would have shown that the very articles, for the keeping and use of which he was nonsuited, were in fact themselves made by the terms of his policy the subject of the insurance, and the jury would have been authorized to find that the policy was written with reference to the continuance of such a business. If they were a part of a watchmaker's materials, they were as much covered by the policy of insurance as the springs, hands, dials, tools, glasses, or any other articles used by a watchmaker in the conduct of his business. If then by the stating clause of the policy itself an article were insured, it surely could not be seriously insisted that the policy would be avoided because of the printed conditions thereinafter appearing, to the effect that the keeping and use of the very article insured in the manner contemplated by the parties should render the policy void. One of the elementary rules for the construction of policies of insurance is, that if there be a conflict between the written statement of the subject of insurance, and the printed conditions of the policy, the former must prevail. A contrary doctrine would present the strange anomaly of an insurance company issuing to another a policy of insurance containing such conditions as that under no circumstances could payment of a loss be thereunder legally demanded. A rule which permitted the printed conditions to control the written statement

of the subject upon which the insurance was issued,
would place the insurance company in the peculiar con-
dition of saying, in effect: I issue you this policy; I
accept your money in satisfaction of my demand for
premiums; I insure your property to be used in your
business, but if you use it, your policy is void.  A par-
allel case, and one which alone adequately expresses the
peculiar paradox in the case supposed, is to be found in
the sage advice given to her youthful daughter when an
affectionate but over-cautious mother, in reply to the
simple request:

> "Mamma, may I go out to swim?"

said to her:

> "Yes, my darling daughter;
> Hang your clothes on a hickory limb,
> But don't go near the water."

Even if the inflammable substances, the keeping and
use of which it is claimed avoided the policy of insur-
ance, were not of themselves a subject of the insurance,
yet if the articles were employed by the assured in
the conduct of the particular business, and the use of
such articles is a necessary incident to the conduct of
such a business, the parties will be presumed to have
contracted with reference thereto, and at the time the
insurance policy was issued the insurer will be presumed
to have had in contemplation the use of such substances
by the assured when he assumed the risk, and, under
such circumstances, will be presumed to have waived
the condition under which the use of such substance
would render the policy void.  For instance, if he in-
sured a powder manufactory, he must have contracted
with reference to the use of combustible materials nec-
essary to be employed in its manufacture.  Thus where
a policy covered property described as a stock such as
is usually kept in a general retail store, and the keep-
ing of gunpowder was prohibited by the printed portions
of the policy, it was held that if gunpowder formed a

part of the general stock usually kept in a retail store, then the keeping of the powder was not a violation of the conditions of the policy. Peoria Fire & Mutual Insurance Company v. Hall, 12 Mich. 202. So if the insurance be upon a printing establishment and the keeping or use of camphene was prohibited, as the policy covered a printer's stock and materials, and it was shown that camphene was necessary to clean the type and was usually employed by printers for that purpose, the prohibition was held not to apply. Harper v. New York City Insurance Company, 22 N. Y. 441. So also the use of kerosene was prohibited, but as the policy covered a photographer's stock, materials, etc., and it being shown that kerosene was usually employed in the business for heating paper and other purposes, it was held that the prohibition did not apply, even though gas could have been used equally as effectually for that purpose. Hall v. New York Insurance Company, 58 N. Y. 292. Those cited are a few of the many cases illustrating the principle which we here announce. We have seen that parol evidence was admissible to explain the meaning of the term "watchmaker's materials" as employed in the policy; and therefore the court erred in repelling the testimony offered by the plaintiff, to the effect that benzine and kerosene, in the quantities in which he kept and used them, were necessary to be used in the conduct of that business; and the testimony so excluded, coupled with such testimony as was already introduced, makes such a case as that, whether we treat the kerosene and benzine in question as included among those articles insured under the general term "watchmaker's materials," or whether we treat them as simply inflammable substances used in connection with and as a part of the business in which the assured was engaged —the property employed by him in which business was covered by this insurance, in either event the jury would

have been warranted in finding in his favor against the company. We therefore conclude that the court erred in granting a nonsuit, and the judgment is accordingly

*Reversed.*