## MITCHELL

*v.*

## THE POTOMAC INSURANCE COMPANY OF GEORGETOWN, D. C.

---

PRACTICE; INSTRUCTIONS TO JURY; FIRE INSURANCE; POLICIES OF INSURANCE, CONSTRUCTION OF; GASOLINE EXPLOSION.

1. A prayer for instruction which is unsupported by or is contrary to the evidence is properly refused.
2. While if the terms of a policy of insurance are ambiguous, the construction most favorable to the insured will be adopted, courts will not be astute to find ambiguities in his favor. Like other contracts, policies of insurance will receive a reasonable interpretation consonant with the apparent object of the parties; and the insured must be presumed to have read his policy and agreed to its terms.
3. Where a policy of insurance upon a stock of stoves and tinware and such other goods kept for sale in a first class retail stove and tin store as are in the store of the insured, in consideration of an extra premium grants the privilege to the insured to keep not more than five barrels of gasoline or other oil or vapor, while printed conditions in the policy relieve the insurer from liability for loss occasioned by explosions of any kind unless fire ensues and then for the loss or damage by fire only, and render the policy void if more than one barrel of oil, etc., shall be kept on the premises at any one time without written consent of the insurer, in an action on such policy where the contention of the insured is that an explosion of gasoline which destroyed his stock of goods was preceded by a fire of which the explosion was an incident, it is not error for the trial court to charge the jury that " this privilege to keep five barrels was inserted to offset the forfeiture of the policy if the provision contained in this policy were violated

16 Ct. App.—17

without this privilege ; " and that if the five barrels of gaso-
line had been kept upon the premises without consent in
writing, the policy would have been forfeited ; and, further,
that the plaintiff understood the terms of his policy when
received, and for that reason asked, obtained and paid for the
privilege,

4. Nor is it error in such a case for the trial court to refuse an
instruction asked by the plaintiff that "If the jury find from
the evidence that the liability to explode with destructive
force is one of the incidents of gasoline vapor under certain
conditions, then the defendant company will be presumed to
have contemplated such effects as fire might or would natur-
ally produce on such vapor when it issued the policy of insur-
ance sued on in this action, and if the jury further find from
the evidence that the prostration of a portion of the building
in which the insured articles were stored and the resulting
damage to such articles were occasioned by an explosion of
gasoline vapor having its origin in fire, the plaintiff is entitled
to recover in this action."

5. In such a case instructions granted on behalf of the defendant
are not erroneous which are to the effect that (1) if the loss
was caused solely by an explosion or ignition of explosive
matter, not caused by a preceding fire, the plaintiff can not
recover ; and that (2) if an explosion occurred from contact of
escaping vapor with a match lighted and held by an employee
of the plaintiff, and the loss resulted solely from such explo-
sion, the verdict must be for the defendant, where the propo-
sitions embodied in such instructions have direct application
to the evidence.

6. Nor, in such a case is an instruction granted on behalf of the
defendant erroneous which is to the effect that loss proceeding
from an explosion caused immediately by the contact of a
lighted match in the hands of plaintiff's employee, with the
escaped gasoline vapor, is not a loss by "fire" within the
meaning of the policy, if supported by the evidence.

7. It is not error for the trial court to charge the jury in such a case
that the parties to the contract of insurance are presumed to
have understood the word "explosion" in its ordinary and
popular sense and "not what some scientific man would
define to be an explosion;" and that "the question here
being explosion or non-explosion, is, what do you, as ordinary
men, understand occurred at that time, in the light of all the
testimony ?  Was it an explosion in the ordinary and popular
sense of that word, or was it a fire with a subsequent explo-
sion, or a subsequent collapse of the building as a sequence to
the fire?" etc.

No. 949.  Submitted February 7, 1900.  Decided March 7, 1900.

HEARING on an appeal by the plaintiff from a judgment of the Supreme Court of the District of Columbia upon the verdict of a jury in an action on a policy of insurance. *Affirmed.*

The COURT in its opinion stated the case as follows:

This was an action upon a policy of fire insurance for the sum of $5,000, originally issued February 3, 1893, and renewed from year to year. The recited premium is $50.

The property insured is thus designated in writing on the face of the policy:

"On his stock of stoves and their findings, tins and tinware, tools of trade and such other goods kept for sale in a first-class retail stove and tin store, situate No. 3108 M street, Georgetown, D. C."

"Privilege granted to keep not more (than) five (5) barrels of gasoline or other oil or vapor."

The policy is in the usual form and contains the following printed provision:

"Against all such immediate loss or damage as may occur by fire to the property specified, not exceeding the sum insured, nor the interest of the assured in the property, except as hereinafter provided, from the 3d day of February, 1893, at twelve o'clock noon, to the 3d day of February, 1894, at twelve o'clock noon; to be paid sixty days after due notice and satisfactory proofs of the same, made by the assured, are received at the office of the company."

In finer print are the following conditions amongst others:

"It being covenanted as conditions of this contract that this company . . . shall not be liable . . . for loss caused by lightning or explosions of any kind unless fire ensues, and then for the loss or damage by fire only."

"Or, if gunpowder, phosphorus, naptha, benzine, or crude earth or coal oils are kept on the premises, or if camphene, burning fluid, or refined coal or earth oils are kept for sale, stored or used on the premises, in quantities exceeding one

barrel at any one time without written consent, or if the risk
be increased by any means within the control  .  .  .  of
the assured, this policy shall be void."

The damage to the insured stock occurred September 27,
1896.   It amounted to $4,568.50, and, as plaintiff admitted,
was due solely to the falling of the building and the crush-
ing of the stock.

The renewal premium for the current year had been
$72.50.   The extra premium was charged for the gasoline
privilege.

The defendant denied liability on the ground that the
fall of the building and injury to the stock had been caused
solely by explosion, and was therefore excepted from the
policy.

The testimony of plaintiff's leading witness, Joseph A.
Oliver, which describes the building and the origin of the
loss, and upon which the case of plaintiff almost entirely
depends is here given as it appears in the bill of exceptions.

"I am the bookkeeper, clerk and general manager for
Milton C. Mitchell, and have been employed by him for
over fifteen years.   During the year 1896 he conducted a
business at 3108 M street in a two-story and attic brick
structure.   His stock consisted of stoves and tinware, and
he did besides a general repairing business.   In front of
the building there was a cellar door three or four feet wide
projecting into the street and built on an incline of eight
or nine inches.   The base of it was about two inches above
the pavement.   There were two swinging doors, made of
$\frac{7}{8}$-inch pine stuff.   These doors were not used as an entrance
to the cellar, but as a means of getting heavy goods into it
down a skidboard.   In the daytime the doors were used as
a sort of display place for light tinware.   There was no
glass or light through these doors, and there was no other
opening in the front part of the cellar through which light
could get.   The first floor was used as a storeroom.   The
openings into this room consisted of a door about four

feet wide and two old-fashioned bay windows, also about four feet wide. The storeroom, which covered the entire first floor, was about seventeen feet on the inside. In this storeroom we kept stoves and tinware and samples, besides smaller things. In the back part of the room space was set apart for an office. The storeroom was about forty feet deep; then there was just back of the main store a small room, where other goods were stored, and where was situated the pumping apparatus for the gasoline tank. This was in the back building. Still further back, on a line lower than the store floor, was our repair shop. There was a small opening between the front and back store, but no door. The gasoline tank was underneath the back cellar floor. It was filled by siphoning the gasoline from barrels into a pipe which came through the floor of the back store. This pipe led from the store floor into the tank. Customers were supplied with gasoline from a pump which was also operated in the back store. On the second floor we had a large stock of vapor stoves and a quantity of castings and tinware that were piled throughout the rooms. In the third floor we had a still heavier line of goods—stove castings and brick and tinware as well. There were three or four 3 x 6 windows in the front wall of the second store. In the attic there were two dormer windows. The only way of getting into the cellar was down some steps from the outside in the rear of the front store. There were no gas jets in the cellar and no artificial lighting of any kind. When near the door we could see without the use of a match or candle or any other light, but seven or eight feet away it was necessary to have artificial light of some kind. In the front cellar we kept stove castings and brick and the surplus of stoves and ranges. Along the sides shelving was arranged, on which brick and castings were put. The heavy goods were unpacked in the cellar. They usually came in parcels, tied with tarred string, and when unpacked the strings were cut and left where cut.

They were inflammable, and besides there was more or less rubbish, paper and excelsior on the cellar floor. The house was heated by a furnace in the cellar, six feet back from the door. The furnace had an ash box to or three inches above the cellar floor. We never had any trouble with the gasoline vapor from the furnace or from matches or candles with which we used to light ourselves about. We frequently had half a dozen candles setting around on the floor when we had much work to do. Between the front and back cellar there was an opening, but no door. The back cellar floor was fifteen or sixteen inches higher than the front cellar floor. The opening between the cellars had a doorsill about four inches high, set in stone and mortar. The top of this sill was four inches higher than the level of the back cellar floor. But for this opening there was a solid brick wall between the front and back cellar. The back cellar was used for like purposes as the front cellar, except that we never put stoves there. It was not lighted except by a small window out into the alley. Matches and candles were used in the back cellar as in the front. When the workmen found what they might be looking for, it was customary to drop these charred matches on the floor or put them on the stoves or castings. The Saturday preceding the fire the gasoline in the tank ran low. We ordered five barrels that afternoon, but only one was sent, which was put into the tank, after which we continued to sell gasoline during the rest of Saturday, which was our busy day. The gasoline tank was practically empty on the Monday following, when four barrels were siphoned into it after eleven o'clock. The tank held five barrels. It was made of galvanized sheet iron, sunk five feet in the ground, and had an iron top. This was fifteen inches below the surface of the ground. It was covered with earth, and on top of that cement was placed. Mr. Mitchell dealt quite largely in gasoline. On Monday, the 28th of September, Mr. Lenz, a customer, called for a particular piece of casting. No one was in the store

but myself and the casting called for was in the cellar. I
went for it down the back cellar steps. It was about one
o'clock in the day. When I went down there was no odor
of gasoline in the cellar. I know the odor, which is pun-
gent, unmistakable and easily detected. The particular
piece of casting that was wanted was in a tier of bins in the
shelving on the east side of the main cellar and about fifteen
feet from the back cellar. It was so far from the door that
I could not see it without the use of a light. On reaching
the tier I struck a match and looked in the particular place
where we were accustomed to keep this kind of casting; but
it was not there. As I had been away from the store for
three weeks previous and did not know to what bin in the
shelves they had been moved, I started looking from one
to the other, beginning near the top. The first match
burned my fingers, and I dropped it and lit another, with
which I continued my search down, when all of a sudden
the place was enveloped or filled with this blue flame. It
was a bluish color, and I knew at once that it was gasoline
vapor that had ignited. I knew it at once because I remem-
bered the appearance of it—had seen it before. Where
it started I do not know; but the first I knew of it, it
was all over the place and I was in the midst of it. I
don't know distinctly whether the blaze started at my
hand or not. When I became conscious of the fact that
there were flames there, it was all over the place; not
only where I was, but all over the cellar. I noticed it
first all over the cellar. There was no noise connected
with it, except the sh-sh-sh like the swish of a whip or
anything of that kind. I could see it play around. I
became unconscious, either from the burns or the walls
falling on me, I don't know which. The first thing I
noticed on recovering consciousness was the fact that the
back cellar was full of fire, and, knowing that the gasoline
was in that part of the cellar, I used every effort to get
as far away from it as possible. I crawled towards the

front, where I was pulled through the front wall. I had been protected from the debris by the way in which the joists fell. They broke in the middle, one end remaining in the east wall and the other resting on the floor, thus leaving a little angle at the side. This condition existed all the way to the front of the building. It was very dark—like the darkness of Egypt. The brick work was shattered in front and the house had fallen down. I was very badly burned, and did not get back to the store for three weeks. The debris had then been taken out and the place cleared up. The back cellar door was always left open in the daytime, and it was the only means of lighting the front cellar. I have experimented with gasoline vapor in a simple way to show customers that when gasoline is confined in a tank or closed vessel. it is perfectly safe. These experiments showed that it is impossible to ignite gasoline so inclosed. The vapor escaping through an opening in the vessel in which gasoline is confined could be lighted, but the flame could not be forced down to the gasoline itself. The vapor burned on the surface with a small blue flame appearing just where the vapor escaped from the can. A matted wire that will hold the fluid can be put down through the burning vapor into the can and brought back all aflame. If again inserted in the can you can hear it sizz as it goes down when passing below the surface of the opening. I have frequently taken a five-gallon can and set the vapor afire at the spout and poured the gasoline through the flame into a basin; the vapor would continue to burn at the spout, and the stream of gasoline, as it passed into the basin, would be afire, but you could put the gasoline back into the can, put the cap on the spout, and all the fire would go out. A gasoline stove could be ignited at the filler opening and gasoline might flow over the stove and take fire, but no damage would be done. The color of the flame of burning gasoline vapor is blue, the kind of flame I saw in the cellar the day the fire or accident

occurred. I did not notice any fire in the back cellar as I went into the front cellar the day of the accident. I was going in the direction opposite to the back cellar. The joists separating the store floor were very old and a condition of dry rot existed in most of them. It was a frequent occurrence for Mr. Mitchell, myself, and other employees to light matches and candles in the cellar. This was more frequent in busy seasons of our work than at other times in the year, and September is one of our busiest months. In the summer time some one or other of us went into the cellar possibly once an hour; in busy seasons, as often as once in fifteen minutes on an average.

"After the accident the gasoline tank was in good condition.

"The pumping machinery connected with the gasoline tank was in the rear storeroom, being three feet from the door, which was always open during the day in the summer time. We had complaints once from our neighbors that they smelled gas. To my knowledge, the neighbors on the east did not complain of the smell of gasoline in their cellars."

On cross-examination the witness testified as follows:

"The occurrence took place on Monday afternoon about one o'clock, and I had returned to work on the Saturday morning previous. I did not notice that day any odor of escaping gases. One barrel of gasoline was put into the tank on Saturday. The supply in the tank was practically exhausted. On the following Monday four barrels of gasoline were delivered and put into the tank. I did not then notice any odor of escaping vapor, except a slight odor of vapor when the gas was being drawn off. There is always some slight odor from it. Mixed with a certain proportion of air, I think, a destructive explosion of gasoline vapor might have taken place in the cellar if a match were lit down there. The piece of casting I was looking for was in a bin about twenty feet north from the back cellar door.

The bins were in the shelving which ran along the east wall, made by boards running up and down. After looking about with the first match along the tier of these bins I started a general hunt for the casting, but did not find it at all. Nothing occurred when I lit the first match, except that I looked and could not find the piece of casting. After I dropped the first match and lit a second all of a sudden the place was enveloped in a flame. It might have been a quarter of a minute or a half a minute. I had been looking with the second match for some time before the fire took place. The first thing I noticed was a bluish flame that filled the entire cellar. Seemed to move around in clouds—it was swishing. I did not notice it near where I was so much as I did in all the surrounding space. It came all at once. When I first noticed it, it filled the cellar. There was no fire in the furnace at the time, and had not been since the previous winter. It was a warm day and I was in my shirt sleeves. The tarred rope and excelsior were scattered about over the cellar floor, and we frequently dropped lighted matches on the floor. The first match did not go out in my hand. My recollection is that it became uncomfortable and I dropped it. I could not say whether or not it was aflame when it fell on the floor. I immediately struck another match. When I recovered consciousness I was protected by the broken cross-beams. Prior to lighting the second match I did not notice any kind of a fire in the back cellar. I might have noticed the fire had it been there, and at the same time I might not."

The following evidence was introduced by the plaintiff concerning the nature and quality of gasoline. William P. Howe testified:

"I am now and for six years have been in charge of the naptha department of the Standard Oil Company. I have been in the petroleum business continuously for over twenty years and have a general knowledge of all its products. I have made a special and independent study of the nature

and properties of the lighter products of crude petroleum. It is like water in color and more or less volatile according to its density. It is largely used all over the country for heating, lighting, domestic fuel, and numerous manufacturing purposes. It is usually kept in stock by dealers in barrels, cans, and tanks of various kinds. The safest way to keep it is in iron tanks sunk in the ground. When so stored there is but little risk by fire from the gasoline itself. It generates vapor at all times. Exposure to currents of air increases the evaporation; artificial heat is not necessary. It is heavier than atmospheric air, and gradually works its way to the ground, running downward like water. It has a very pungent odor, which can not be mistaken. If the layers of vapor be stirred by artificial means, such as an electric fan or light breeze, for instance, and the vapor comes in combination with air in the proportion of, say, 5 per cent. of vapor to 95 per cent. of air, it becomes an explosive mixture. A person could not go into a room so charged without detecting the odor.

"Undisturbed, layers of vapor will lie along the floor with a level surface like water, and are then highly inflammable. The vapor burns rapidly with a bluish-yellow flame. A peculiarity of this vapor is that once in the open air it will sink to the lowest possible level in the absence of currents or draughts of air or other similar disturbing causes.

"When gasoline is kept in an underground tank there is little or no danger from fire. Great care should be taken to prevent the escape of vapor. When kept in tanks, if the gasoline gets low, vapor will be generated and forced out when the tank is refilled.

"Very little gasoline vapor would be needed to create an explosion if mingled with a large proportion of air. To make an explosion sufficient to create a great amount of damage, the vapor would have to be distributed generally throughout the cellar. Its presence under these circumstances would be detected by the odor. If undisturbed by

currents of air or other similar causes, layers of vapor might accumulate on a cellar floor in quantities, if ignited, to produce a vacuum by quick combustion. This is the chief danger from the presence of vapor in a cellar. Gasoline vapor is ignited by a blaze or a spark and burns like a flash."

Charles E. Munroe testified, on direct examination, as follows:

"I am professor of chemistry at Columbian university and have been in the practice of chemistry since the year 1871. I was professor of chemistry at the United States Naval Academy from 1874 to 1876, and was chemist at the United States torpedo station and war college from 1876 to 1882. In my lectures I have been teaching students regarding the properties of gasoline and other petroleum products and made repeated experiments therewith. It is a clear liquid, which gives off vapors having a characteristic odor.

"These vapors in contact with oxygen or air are highly combustible. Gasoline itself will not burn and will not explode and has no explosive properties outside of the vapor which it generates. It gives off vapor at all ordinary temperatures, even at the freezing point of water and more readily the higher the temperature and when exposed to draughts. Gasoline vapor is about three times as heavy as air and will fall through the air. It flows like a liquid over the surface on which it is until it has reached the lowest point, like all other liquids, tending to assume a position of equilibrium. If the quantity of air mixed with it is considerable, it burns with a pale-blue flame. In the proportion of 50 per cent. of vapor to 50 per cent. of air, it is not explosive. So with 2 or 3 per cent. of vapor and 97 or 98 per cent. of air. Between 5 and 25 per cent. it is explosive or goes off with a vigorous puff. With 10 per cent. of vapor and 90 per cent. of air we have a maximum violence. Five per cent. of vapor and 95 per cent. of air results in a vigorous puff on the ignition of the mixture. So, when the percentage of vapor is as great as 25 per cent. Below 5 and

above 25 per cent. the mixture burns with a constantly diminishing speed. It may be ignited by a flame or by electric sparks, but not by a common spark. It never ascends when undisturbed. A person igniting gasoline vapor with a match could not fail to be aware of the fact. Gasoline vapor dissipates when it is exposed unconfined to another atmosphere. The rapidity with which it dissipates depends upon circumstances. If it is constantly stirred up by persons walking through it or in any other way, it dissipates very rapidly."

Asked to define " explosion," the witness answered:

"An explosion is the result due to the conversion of a solid or liquid into a gas, or the expansion of a gas, which is accompanied with a loud report and the shattering of the material about it."

Asked to draw a distinction between "quick combustion" and "slow explosion," the witness answered:

"It is exceedingly difficult to draw a sharp line between any systems of classification.

"One volume of gasoline will give off 140 volumes of gasoline vapor. There are 4,653 cubic feet in Mitchell's front cellar; 1,252 feet in the back cellar. To give 3 per cent. of vapor in the front cellar would take 7.4 gallons of liquid gasoline; a 10 per cent. mixture, 24.7; a 25 per cent. mixture, 61.7. To give a 3 per cent. mixture in the back cellar would require 1.9 gallons of liquid gasoline; 10 per cent., 6.4 gallons; 25 per cent., 15.9 gallons. If Mitchell's tank were empty of gasoline the volume of vapor it might contain, if forced out, would be 3.1 by volume of the cubic contents of the back cellar.

" The ordinary pressure of the atmospheric air is 15 pounds to the square inch. This pressure upon an area equal to the surface of plaintiff's store floor would be 641 tons. The pressure upwards being the same, equilibrium results. At the rate of one pound per square inch the pressure on an area equal to Mitchell's store would be nearly 43

tons.   The result of a rapid combustion of gasoline in the cellar would be an expansion of the atmosphere in the cellar, producing a pressure.   On the completion of the combustion there would be a vacuum formed by the cooling of this expanded air and the product of the combustion.   It would be greater or less in proportion to the consumption of the air and the expulsion of the air."

The witness, having stated that he had heard the testimony of the witness Oliver as well as he could catch it, said, when asked to express an opinion as to the cause of the prostration of plaintiff's building:

" From the testimony, as I heard it, I am of the opinion that the building was prostrated through the combustion of some body there or some substance there that burned rapidly, and that as a result of this rapid combustion, there being, according to Mr. Oliver's testimony, but a pshing sound in the burning by the increased pressure, the floor was raised to a slight extent, and then, by the condensation, there was a pressure brought to bear upon the upper surface of the floor, and then it gave way.   That, from my observation and hearing his testimony, is the impression I have got and the opinion I hold."

On cross-examination the witness further testified as follows:

"Gasoline vapor is not regarded as a very explosive article by scientists, and it is not explosive except in proper proportions with the atmosphere.   The gasoline itself is no more explosive than wood or any other substance.   If the vapor comes out of a tank it must mix with the atmosphere as it comes out, and, as it mixes with the atmosphere in the proportions I have mentioned, the mixture is an explosive, and regarded as a very violent explosive, and I have so taught.   Whether it is dangerous or not will depend upon the proportion of gasoline vapor in combination with air. An amount which is not dangerous can be detected by its odor.   A proportion which is present in the atmosphere to

such an extent as to create an explosion can not be determined by its odor. It is considered dangerous to bring this gasoline, or the fumes of this gasoline, near a lighted match or fire of any kind. There are many records of explosions resulting from contact of fire with these vapors, and a good many times explosions have occurred from vapor from small bottles of benzine used in cleaning gloves, a match being lighted in the room."

On redirect examination the witness further testified:

"Gasoline vapor, being three times heavier than air, soon seeks the lowest point, as water or any other liquid does. It flows down and stays there, forcing the atmosphere out. The heaviest vapor settles on the floor and stays there. It acts in all respects like water; it falls on the floor or earth and flows to the lowest point, until it reaches a condition of equilibrium—a level surface. There it remains until stirred by mechanical means. When in combination with air in the proportion of from 7 to 19 per cent. of vapor it is as certain to explode as gunpowder, and the pressure approximates to that produced by gunpowder."

In response to questions by the court, the witness testified further:

"As the percentage is increased the weight of the vapor is lessened and becomes nearer to the average of atmospheric air. The vapor of gasoline is entirely free of oxygen or air."

By the Court:

Q. "You based your opinion, I believe, of the cause of the explosion largely upon the circumstance that Mr. Oliver stated he heard a swish?" A. "Largely that."

A witness, who was a policeman at the time, saw "a little blaze oozing out quite near the back cellar steps and coming from underneath a pile of debris."

The defendant offered in evidence the written proof of loss that had been submitted by plaintiff November 9, 1896, claiming $2,500 damages, and read the following clause:

" That the fire originated in the ignition on the basement floor of bits of paper or straw, followed by an explosion of gasoline gas, as is supposed."

Other evidence was offered by the defendant, tending to show that the owner of the adjacent house had detected the odor of gasoline vapor in his cellar at times before the accident and had called plaintiff's attention to it. That several persons within a block or two heard something like the " boom " of an explosion ; one of them likening it to the sound of the sunset gun at Fort Meyer. That a. fireman who arrived early upon the scene saw a little smoke coming out of the cellar of the back building, looked in and saw "a can on a barrel, a pint cup, and there was a little blaze coming out of it with something in it burning; that was all the fire there was."

In rebuttal, five witnesses for the plaintiff testified to being in the street near by and hearing the sound of the falling walls and crashing stoves and tinware, unpreceded by the loud " boom " heretofore referred to. One of these said: "I heard just a rumbling noise—the building tumbling in. When the flash came out of the cellar door, I think it flew open."

Another said: "As the car passed I heard a noise, something like a bad firecracker, and then ' pfeu-pfeu,' that blew out the wall. The report was just loud enough to hear a block away; something on that order. The first thing I heard was a ' pfeu-pfeu.'"

A third said: "The noise which attracted my attention was such a noise as the rushing of large bodies of air through a small opening would make. There was no report. Immediately after the concussion there was the noise of breaking glass, rattling tins, and I think the noise afterwards of the dropping of the roof. There was no explosion at all; just merely a concussion like ' shu-shu.'"

The case was submitted to the jury upon the foregoing evidence, and resulted in a verdict for the defendant.

*Mr. Samuel Maddox* for the appellant:

1. Plaintiff's first prayer should have been granted, as there was some evidence tending to prove that there was fire in the back cellar at the time Oliver struck the second match. Whenever there is a question of fact before the court and there is any testimony, no matter how slight, tending to prove the existence of such fact, the question is one within the peculiar province of the jury, and it is reversible error in the court to withdraw it from them. *Railroad Co.* v. *Powers,* 149 U. S. 43. If the jury had found that there was a fire, however slight, in the back cellar, just before the explosion and causing it, their verdict must have been for the plaintiff. *Insurance Co.* v. *Dorsey,* 56 Md. 70; *Washburn* v. *Insurance Co.,* 2 Fed. Rep. 304; *Washburn* v. *Insurance Co.,* 2 Fed. Rep. 633; *La Force* v. *Insurance Co.,* 43 Mo. App. 518.

2. Gasoline was part and parcel of the appellant's stock in trade, and was, and was intended to be protected by the insurance. If there was any doubt about the meaning of the policy in this respect, that doubt must be resolved in favor of the assured. *Insurance Co.* v. *Coos Co.,* 151 U. S. 462; *Dumas* v. *Insurance Co.,* 12 App. D. C. 245; *Dows* v. *Insurance Co.,* 127 Mass. 348. But there can be no doubt about the meaning of the policy *quoad* the property covered by the insurance. The property insured is described as being "his stock of stoves and their findings, tins and tinware, tools of trade, and such other goods kept for sale in a first-class retail stove and tin store, with the privilege granted of keeping not more than five barrels of gasoline or other oil or vapor." The indemnity is against "all such immediate loss or damage as may occur by fire to the property specified," and gasoline constitutes an essential part of the property specified. If a fire had occurred which destroyed the gasoline and nothing else it can not be doubted but that the appellant could have recovered its

value under the policy. This, too, even without the "privilege," if at the time the policy was issued the agent of the company knew that the assured dealt in gasoline. *Insurance Co.* v. *Jones*, 62 Ill. 460; *Van Schaick* v. *Insurance Co.*, 68 N. Y. 438; *The Majestic*, 166 U. S. 375. The term "stock in trade" in a specified business, when used as matter of description in a policy of insurance, includes, besides materials, everything necessary for carrying on that business. *Harper* v. *Insurance Co.*, 17 N. Y. 197; *Insurance Co.* v. *Taylor*, 5 Minn. 397; *Archer* v. *Insurance Co.*, 43 Mo. 441; *Mascott* v. *Insurance Co.*, 68 Vt. 253; *Maril* v. *Insurance Co.*, 95 Ga. 604.

3. If the liability to explode with destructive force is one of the incidents of gasoline vapor when ignited, the appellee company must be presumed to have contemplated such effects as fire might naturally produce on such vapor when it issued the policy sued on in this action. *Hoffman* v. *Insurance Co.*, 32 N. Y. 405; *Viele* v. *Insurance Co.*, 26 Iowa, 66; *Branard* v. *Insurance Co.*, 27 Mo. App. 26; *Fraim* v. *Insurance Co.*, 170 Penna. St. 151; *Faust* v. *Insurance Co.*, 91 Wis. 158; *Yoch* v. *Insurance Co.*, 111 Cal. 503; *Harper* v. *Insurance Co.*, 22 N. Y. 441; *Gas Co.* v. *Insurance Co.*, 158 Mass. 570: 20 L. R. A. 297.

4. The court below was clearly wrong in that portion of the charge to the jury which restricted the meaning of the word "explosion" to what the "ordinary man would understand to be meant by that word." This is utterly at variance with the requirements of the well-settled rule of interpretation as applied to insurance contracts, which is, "that where a contract of insurance is so drawn as to be ambiguous, or to require interpretation, or to be fairly susceptible of two different constructions, so that reasonably intelligent men on reading the contract would honestly differ as to the meaning thereof, that construction will be adopted which is most favorable to the assured." *Insurance Co.* v. *Coos Co.*, 151 U. S. 462. It is also at variance with that other well

established rule which holds that, "conditions providing for disabilities and forfeitures are to receive, when the intent is doubtful, a strict construction against those for whose benefit they are introduced." *Hoffman* v. *Insurance Co.*, 32 N. Y. 405.

*Mr. William A. Gordon* and *Mr. J. Holdsworth Gordon* for the appellee.

Mr. Justice SHEPARD delivered the opinion of the Court:

1. The first assignment of error is founded on the refusal of the court to give the following instruction to the jury :

" If the jury find from the evidence that on the 28th day of September, 1896, at or before the time the witness Oliver went into the cellar of the plaintiff's premises, as described by him, a fire originating in accidental or other causes was in progress in the back cellar of said premises, and that afterward and while such fire was in progress the gas or vapor generated by the evaporation of liquid gasoline came in contact with .the flames of such fire and exploded and prostrated portions of the building in which the insured commodities were stored, then the damage done to such commodities by reason of such prostration was occasioned by fire within the meaning of the policy, and the plaintiff is entitled to recover in this action."

The evidence on behalf of the plaintiff has been fully recited in the preliminary statement. In addition to this there was some evidence of the defendant showing the issue of smoke from the rear of the building and the existence of a very small flame in the rear cellar after the explosion, and on which appellant also relies. It is unnecessary, therefore, to review the testimony. The instruction undertook to direct the special attention of the jury, first, to the probable existence of an accidental fire in the rear cellar before the entry of the witness, Oliver, into the front one, and second, to the probable ignition of the vapor in the front cellar by that fire

instead of by the match lighted by Oliver immediately
before the explosion took place in the front cellar.  Neither
of these inferences seems to have any reasonable foundation
in the evidence, and the second is directly opposed to the
testimony of Oliver, upon which the plaintiff's case rests.
Had this been the only issue in the case, the court might,
without error, have directed a verdict for the defendant.
*Gunther* v. *Liverpool, etc., Ins. Co.*, 134 U. S. 110, 116.

The plaintiff's right to have the general issue submitted
to the jury, whether the explosion was directly caused by
the lighting of the match by Oliver, or by accidental fire of
any kind existing before, or proceeding indirectly from, the
lighting of the match, is not involved in this record.   The
court gave the second instruction prayed by the plaintiff to
the effect, that, if the "loss or damage was the result of fire
not having its origin or commencement by or with an explo-
sion of any sort, but by the accidental combustion of any
non-explosive substance in the cellar of plaintiff's premises,
and that in consequence of such combustion the front build-
ing erected on said premises was prostrated, and the loss or
damage to the insured was the immediate result thereof,
then the loss was occasioned by fire within the meaning of
the policy."

This was supplemented in the general charge as follows:

"It is not contended that any fire followed the explosion,
and that any portion of this stock in trade was injured by
a subsequent fire, but it is claimed by the plaintiff that
there existed a precedent fire, and that the explosion was an
incident of that precedent fire.   The court has granted an
instruction to the effect that if there existed upon the prem-
ises a fire, and that the explosion, if there was an explosion,
followed as an incident to that fire, then the loss to the
plaintiff would be really occasioned by the fire, for the explo-
sion would be nothing but an incident to the fire."

We must hold that this assignment of error is not well
taken.

2. The second and third assignments of error are dependent upon each other, to a great extent, and can be more conveniently considered together.

After reading the description of the articles insured, as written in the policy, with the accompanying words: "Privilege granted to keep not more than five barrels of gasoline or other oil or vapor;" and the printed clause prohibiting the keeping of such oils "in quantities exceeding one barrel at any one time, without the the written consent of the company," the court said to the jury: "Clearly this privilege to keep (five barrels) was inserted to offset the forfeiture of the policy if the provision contained in this policy were violated without this privilege."

The court added, also, that if these five barrels of gasoline had been kept upon the premises without consent in writing, the policy would have been forfeited; and, further, that the plaintiff understood the terms of his policy when received, and for that reason asked, obtained and paid for the privilege.

The third assignment is on the refusal of the court to give the plaintiff's third prayer, as follows:

" 3. If the jury find from the evidence that the liability to explode with destructive force is one of the incidents of gasoline vapor under certain conditions, then the defendant company will be presumed to have contemplated such effects as fire might or would naturally produce on such vapor when it issued the policy of insurance sued on in this action, and if the jury further find from the evidence that the prostration of a portion of the building in which the insured articles were stored and the resulting damage to such articles were occasioned by an explosion of gasoline vapor having its origin in fire, the plaintiff is entitled to recover in this action."

Appellant maintains two propositions under these assignments: First. "Gasoline was part and parcel of the appellant's stock in trade, and was, and was intended to be,

protected by the insurance." Second, "If the liability to explode with destructive force is one of the incidents of gasoline vapor when ignited, the appellee company must be presumed to have contemplated such effects as fire might naturally produce on such vapor when it issued the policy sued on."

(1) Before considering the argument and authorities relied on to support these propositions, a preliminary contention of the appellant may be conceded as a correct statement of an abstract proposition; namely, that doubts about the meaning of the terms of a policy of insurance are to be resolved in favor of the assured.

This does not mean, however, that contracts of insurance shall not, like all other contracts, receive a reasonable interpretation consonant with the apparent object and intent of the parties thereto. Courts should be no more astute to find ambiguities in contracts of insurance than in other contracts. True it is, that they contain elaborate conditions, often in fine print, and sometimes of no application to the particular insurance effected, because of the adaptation of one standard blank form to widely distributed risks; yet one who accepts a policy, like one who accepts a conveyance or executes a mortgage, under no circumstances of mistake or imposition, must be presumed to have read the instrument and agreed to its terms.

Whenever those terms and stipulations are ambiguous, whether by the addition of written words or not, and are susceptible of two meanings about which reasonably intelligent men can honestly differ, then, undoubtedly, the construction most favorable to the assured must be adopted. *Dumas* v. *Insurance Co.*, 12 App. D. C. 245, 255, 256; *Imp. Fire Ins. Co.* v. *Coos Co.*, 151 U. S. 452, 463.

(2) The proposition that gasoline was part of the insured stock and itself protected by the policy, is of practical importance only as a foundation for the next proposition.

This is, that, being so insured and its liability to explode

with destructive violence, through ignition of its vapor, being well known, the insurer must be presumed to have contemplated this possible result and to have embraced it within the assumed risk.

The contention is, that a conflict is raised between the written part of the policy, describing the property insured, and the forfeiture clause relating to the keeping of explosive oils, wherefore the latter must give way.

Gasoline is not specifically named, but the claim is that it is included in the description, because it is an article usually "kept for sale in a first class retail stove and tin store situated in Georgetown, D. C."

It would probably be a sufficient answer to say, that there was no direct evidence offered to show that gasoline was usually kept for sale in such stores. The court can not take notice of the existence of such custom or usage, or supply proof by construction. *Georgia Home Ins. Co.* v. *Jacobs*, 56 Tex. 366.

Assuming that there may be ground, under all the circumstances of the case, for inferring that gasoline was by custom and usage, an article ordinarily kept for sale in such stores, there is much authority in support of appellant's contention. *Phœnix Ins. Co.* v. *Taylor*, 5 Minn. 492; *Pindar* v. *Kings Co. Ins. Co.*, 36 N. Y. 648; *Mascott* v. *Granite State Ins. Co.*, 68 Vt. 253; *Viele* v. *Germania Ins. Co.*, 26 Iowa, 1, 66; *Lancaster Silver Plate Co.* v. *Insurance Co.*, 170 Penna. St. 151, 163; *Harper* v. *Albany Ins. Co.*, 17 N. Y. 194; *Harper* v. *N. Y. Ins. Co.*, 22 N. Y. 441; *Archer* v. *Insurance Co.*, 43 Mo. 434; *Maril* v. *Conn. Ins. Co.*, 95 Ga. 604; *Yoch* v. *Home Mut. Ins. Co.*, 111 Cal. 503; *Faust* v. *Am. Fire Ins. Co.*, 91 Wis. 158, 162; *Hall* v. *Insurance Co.*, 58 N. Y. 292.

It is proper to add, however, that in each of the foregoing cases, except the three first named, the situation was exceptional.

The question arose, either where there was insurance upon the materials of a trade or where permission had

been given to carry on a trade or manufacture as, for example, that of bookbinder, printer, photographer, metal plater, painter and the like. Proof was permitted to show that some of the extra-hazardous or forbidden articles of a succeeding printed clause, were commonly, and had for a long time been generally, used in successfully carrying on such trade or manufacture.

In view of that proof the conclusion was, that the insurer, knowing those facts, must also be presumed to have contemplated the carrying on of those trades and manufactures in the usual and ordinary manner, and with those articles and materials without which their operation must have been suspended or seriously impaired; and, hence, that the written clause, with this meaning, must necessarily override or qualify the conflicting printed condition of forfeiture.

The doctrine of some of the foregoing cases, to the effect that an insurance of goods usually kept in a general retail or country store, will cover, or permit the keeping of gunpowder and other explosives in reasonable quantities, notwithstanding the succeeding printed prohibitory clause, is opposed to some well considered decisions. *Birmingham Fire Ins. Co.* v. *Kroegher*, 83 Penna. St. 64; *Western Assurance Co.* v. *Rector*, 85 Ky. 294; *Beer* v. *Insurance Co.*, 39 Ohio St. 109.

As was said in the last of those cases, their doctrine is not necessarily inconsistent with the doctrine of those relating to insurance upon trades and manufactures, or permitting the same, as including their usual materials and accessories.

In one class of cases, the trades insured, or permitted in connection with the things insured, could not reasonably be carried on without the constant use of certain hazardous accessories. In the other, carrying for sale a specially hazardous article in a stock of general merchandise would have no reasonably material relation to the other articles and to the general prosecution of the business. In fact, as suggested

in one of the cases last cited, the reason for the prohibition may arise from the fact that the custom of selling powder does exist in a general country store; for if those articles were not frequently carried in such stocks there would be no need for the prohibition.

The point has been settled for our guidance, however, by the Supreme Court of the United States. *Steinbach* v. *Insurance Co.*, 13 Wall. 183. That decision, though accompanied by a very brief opinion, is directly in point, and we do not find that it has ever been questioned by the same tribunal.

The single question decided was, that evidence was inadmissible on the part of the plaintiff to show that fireworks were included in the description of the insured goods, concluding with "other articles in his line of business," in the face of a printed condition requiring that written permission to keep fireworks must be procured.

(3) For another reason, the case at bar could not be governed by the rule asserted by the appellant, even were there no question of the general recognition of its soundness. It differs materially from the cases supporting that rule in this—that, in connection with the written description of the property insured, appears the written consent of the insurer "to keep not more than five barrels of gasoline, or other oil or vapor."

This privilege, given in writing in strict accord with the condition of the printed forfeiture clause, shows conclusively that the plaintiff was informed of that clause, and believed that his policy would become void if he should keep more than one barrel of gasoline in his storehouse. Desiring to keep more than one barrel, and not more than five, he asked for the privilege, paid for it, and had it entered in writing in the body of the policy. The court was right, therefore, in telling the jury that this privilege had been inserted to avoid the forfeiture that would otherwise arise through violation of the prohibitory clause.

(4) The prohibitory clause of the policy shows, as a

matter of course, that the insurer apprehended the danger of
keeping gasoline upon the premises.  And it may there-
fore be presumed as contended by the appellant, that it
well knew the particularly dangerous property of that fluid
to be its emission of vapor, that is highly explosive under
certain conditions.  It is plain, also, from the terms of the
policy, that the insurer became liable for the resulting dam-
age of a possible explosion caused by a precedent fire, as
well as for all damage by fire ensuing an explosion from
any cause.

Both of these extra risks were greatly increased by the
additional quantity of gasoline permitted to be kept in the
stock, and for these increased risks the insurer required and
received an extra premium.  But it does not follow that it
assumed each and every risk of damage as a result of pos-
sible explosion.  Whatever might be the established rule of
liability in such cases for all damages by explosion, whether
caused by precedent fire, or by fire ensuing, in the absence
of further stipulation relating thereto, it has no application
to this case.

The policy in this case does not admit of that question,
It contains a further express condition that the insured shall
not be liable for loss " caused by lightning, *or explosions of
any kind, unless fire ensues, and then for the loss or damage by
fire only.*"

What has heretofore been said respecting the continued
force and obligation of the special prohibitory clause, is
applicable in general to the foregoing.  The condition is
plain, and is involved in no ambiguity through the terms of
the written description or the privilege written therewith.
Taken in connection with these, and the prohibitory clause
with which it accords, it appears, that the insurer appre-
hended increased risks from the explosive property of gas-
oline, and that for a superadded premium it assumed two
of these additional risks, namely, that of damage by fire
increased by incident explosion, and that of loss and damage

by fire ensuing an explosion that may have resulted from any cause whatever. The remaining risk, namely, that of loss or damage by explosion of any kind, not resulting from an ensuing fire, was cast, or left to rest, upon the insured.

The plaintiff's third prayer for instruction, being opposed to this view, was rightly refused.

3. The fourth assignment of error is on exceptions taken to four special instructions given by the court at the request of the defendant.

The substantial effect of these instructions may be thus stated:

(1) If the loss was caused solely by an explosion or ignition of explosive matter, not caused by a preceding fire, the plaintiff can not recover.

(2) If an explosion occurred from contact of escaping vapor with a match lighted and held by an employee of the plaintiff, and the loss resulted solely from such explosion, the verdict must be for the defendant.

(3) A match lighted and held by an employee of the plaintiff, coming in contact with the vapor and causing an explosion is not to be considered as "fire" within the meaning of the policy.

A glance at the testimony set forth in the preliminary statement shows that these propositions have direct application thereto. That there was no error in embodying the two first in specific instructions to the jury, follows from what has been said touching the refusal of the plaintiff's third special instruction, under the preceding assignment. Nothing more needs to be added.

The last instruction, to the effect that loss proceeding solely from an explosion caused immediately by the contact of a lighted match, in the hands of plaintiff's employee, with the escaped gasoline vapor, was not a loss by "fire" within the meaning of the policy, states a sound proposition of law as applied to the terms and conditions of the policy under consideration. This conclusion is not only in

accordance with what seems to be the plain and reasonable meaning of the whole contract of insurance as embodied in the policy, but has also the support of a number of well considered decisions. *United Life, etc., Ins. Co.* v. *Foote,* 22 Ohio, 340, 348; *Briggs* v. *N. A. Ins. Co.,* 53 N. Y. 346; *Trans-Atlantic Fire Ins. Co.* v. *Dorsey,* 56 Md. 70, 80; *Heuer* v. *N. W. Nat. Ins. Co.,* 144 Ill. 393, 397.

Any other view than this would limit the operation of the condition to the one kind of explosion that does not involve ignition or combustion as its agent, when there is nothing in its terms to indicate that any such limitation was intended.            •

This identical clause was contained in the policy under consideration in *Heuer* v. *Insurance Co., supra,* wherein it was said by Mr. Justice Magruder, who delivered the opinion, in language that sets forth the very case we have here:

"The use of the expression, 'explosion of any kind,' contemplates the existence of more than one kind of explosion. Without undertaking to make an accurate classification, we deem it sufficient to say, that one kind of explosion is that which is produced by the ignition and combustion of the agent of explosion, as where a lighted match is applied to a keg of gunpowder, and another kind of explosion is that which does not involve 'ignition and combustion of the agent of explosion,' as where steam, or any other substance, acts by expansion without combustion. *Scripture* v. *Lowell Ins. Co.,* 10 Cush. 356. The exemption clause is broad enough to embrace both kinds of explosion. As the present case, where it appears that a lighted match was applied to the illuminating gas confined in the basement of a building, furnishes an instance of the first kind of explosion above specified, it manifestly comes within the terms of the exemption. . . . Where a lighted match is applied to a keg of gunpowder, or to illuminating gas confined in a room, and an explosion thereby occurs which causes damage, but is not followed by combustion, the explosion is the

proximate cause of the injury, and the lighted match is only the remote cause. In such case fire does not reach the property injured, but the concussion resulting from the explosion damages it. Here the goods insured were not brought in contact with the fire produced by the lighting of the match, but with the explosive power of a fireless concussion, which caused the floor of the store in which they were situated to fall, and thereby occasioned the injury."

4. The fifth and last assignment is on exceptions taken to the charge of the court explaining the meaning of the word explosion as used in the policy.

Referring to the testimony as it appears in full in the preliminary statement, it will be seen that several witnesses heard a loud report preceding the collapse of the building. Others heard a fizzing sound accompanied by the crash of the building and its contents.

The witness Oliver, whose match ignited the vapor, said he heard a sound "like the swish of a whip," and then immediately became unconscious. Some evidence, denied by Oliver, tended to show that shortly after the accident he said that when he struck the match he heard a "sizz," and also that he said, "it blew up."

One of the plaintiff's witnesses saw a flash coming from the inclined cellar door opening on the sidewalk, which door he thought flew open.

The contention of the plaintiff, founded on the expert evidence of Professor Munroe, was, that the collapse of the building was the result, not of explosion, but of rapid combustion of the gasoline vapor which first expanded the atmosphere of the cellar, and then, through cooling, produced a vacuum that caused the crushing in of the floor by the unresisted pressure of the external atmosphere.

Professor Munroe also testified that: "An explosion is the result due to the conversion of a solid or liquid into a gas, or the expansion of a gas, which is accompanied with a loud report and the shattering of the material about it."

Asked on cross-examination to draw a distinction between "quick combustion" and "slow explosion," he said: "It is exceedingly difficult to draw a sharp line between any systems of classification."

The court, after stating this contention and referring to Professor Munroe's definition, informed the jury that the parties to the contract are presumed to have understood the word "explosion" in its ordinary and popular sense—"not what some scientific man would define to be an explosion, but what the ordinary man would understand to be meant by that word."

That "the question here being explosion or non-explosion, is, what do you, as ordinary men, understand occurred at that time, in the light of all the testimony? Was it an explosion in the ordinary and popular sense of that word, or was it a fire with a subsequent explosion, or a subsequent collapse of the building as a sequence to the fire?"

That "an explosion produced by ignition, according to common understanding, may be accurately enough described for practical purposes as a sudden and rapid combustion causing a violent expansion of the air and producing a report more or less loud according to the resistance offered. That it greatly varies in its degrees of violence and the effects produced, are facts fully within the experience of every one."

In our opinion this charge has application to the whole of the evidence, contains a correct declaration of the meaning of the exemption clause of the policy, and is an apt statement of the precise question to be determined by the jury.

Where the terms of a contract of insurance are clear and unambiguous they are to be taken and understood in their plain, ordinary, and popular sense. *Imperial Fire Ins. Co.* v. *Coos Co.*, 151 U. S. 452, 463.

The last paragraph of the charge, as quoted above, was taken from the opinion of the Court of Appeals of Maryland,

in a case which we have before referred to with approval. *Trans-Atlantic Ins. Co.* v. *Dorsey*, 56 Md. 70, 81. See, also, *Insurance Co.* v. *Foote*, 22 Ohio St. 340, 347.

This disposes of the last question in a case that has been conducted on both sides with signal zeal and ability.

Having found no error in the proceedings below the judgment will be affirmed, with costs. ˙ It is so ordered.

*Affirmed.*

A writ of error to the Supreme Court of the United States was allowed, on motion of the appellant, March 20, 1900.